E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JOSEPH O. JOHNS (Cal. Bar No. 144524)
Senior Trial Attorney
Environmental Crimes and Consumer Protection Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4536/894-2484
    E-mail: Joseph.Johns@usdoj.gov

AMANDA N. LISKAMM
Director
Consumer Protection Branch
NATALIE N. SANDERS
SPEARE I. HODGES
STEPHEN J. GRIPKEY
Trial Attorneys
    450 5th Street NW, Suite 6400 South
    Washington, DC 20001
    Telephone: (202) 307-0048
    E-mail: stephen.gripkey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>SIMON CHU and<br>CHARLEY LOH,<br><br>        Defendants. | No. CR 19-193-DSF<br><br>**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT AND FOR A NEW TRIAL**<br><br>Motion Hearing Date:<br>**February 26, 2024**<br><br>Hon. Dale S. Fischer |

Plaintiff, United States of America, by and through its counsel of record, Trial Attorneys Natalie N. Sanders, Speare I. Hodges, and Stephen J. Gripkey of the U.S. Department of Justice's Consumer Protection Branch, and Senior Trial Attorney Joseph O. Johns of the U.S. Attorney's Office, hereby files its opposition to Defendants' Motion for Judgment of Acquittal Notwithstanding the Verdict and for a New Trial ("Opposition") in the above-captioned matter. The Government's Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 1, 2024          Respectfully submitted,

AMANDA N. LISKAMM
Director
Consumer Protection Branch

*/s/*
NATALIE N. SANDERS
SPEARE I. HODGES
STEPHEN J. GRIPKEY
Trial Attorneys

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

*/s/*
JOSEPH O. JOHNS
Senior Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iv

I.     INTRODUCTION ....................................................................................... 1

II.    LEGAL STANDARDS ............................................................................... 2

    A.    Rule 29 Standards ............................................................................ 2

    B.    Rule 33 Standards ............................................................................ 4

III.    ARGUMENT ............................................................................................... 4

    A.    There is no basis for vacating the *Klein* conspiracy conviction ................... 4

    B.    There is no basis for ordering a new trial .................................... 15

        1.    The Jury Instruction ........................................................... 16

        2.    Exhibit 1033 ....................................................................... 21

IV.    CONCLUSION .......................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*United States v. Alston,*
   974 F.2d 1206 (9th Cir. 1992) ...............................................................4

*United States v. Cloud,*
   No. 22-30173, 2024 WL 49808 (9th Cir. Jan. 4, 2024) ...........................4

*United States v. Del Toro-Barboza,*
   673 F.3d 1136 (9th Cir. 2012) ...............................................................3

*United States v. Galecki,*
   89 F.4th 713 (9th Cir. 2023) .................................................................19

*United States v. Hart,*
   963 F.2d 1278 (9th Cir. 1992) ..............................................................19

*United States v. Klein,*
   247 F.2d 908 (2d Cir. 1957) ...................................................................1

*United States v. Miller,*
   953 F.3d 1095 (9th Cir. 2020) ...............................................................2

*United States v. Nevils,*
   598 F.3d 1158 (9th Cir. 2010) (en banc) ...............................................3

*United States v. Pimentel,*
   654 F.2d 538 (9th Cir. 1981) ..................................................................4

*United States v. Powell,*
   469 U.S. 57 (1984) ...............................................................................19

*United States v. Rocha,*
   598 F.3d 1144 (9th Cir. 2010) ...............................................................3

**Statutes**

15 U.S.C. § 2064(b)(4) ...............................................................................16

**Regulations and Rules**

16 C.F.R. §
   1115.14(d) ............................................................................................16

iv

1115.14(e) ..................................................................................................16

Fed. R. Crim. P. 29..............................................................................passim

Fed. R. Crim. P. 33..............................................................................passim

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On November 16, 2023, the jury returned guilty verdicts on two counts as to each Defendant. As specified by the jury, the conviction under Count I concerns a conspiracy to defraud the United States by using deceitful or dishonest means to frustrate and obstruct the lawful functions and efforts of the United States Consumer Product Safety Commission ("CPSC").  The conviction under Count II concerns a knowing and willful failure to immediately report to the CPSC information that reasonably supported the conclusion that the dehumidifiers at issue contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death ("failure to immediately report").  Verdict Form, ECF No. 158.

The Defendants' Motion for Judgment of Acquittal Notwithstanding the Verdict and for a New Trial ("Defendants' Motion") asserts that Count I should be vacated for insufficient evidence under Fed. R. Crim. P. 29 ("Rule 29"), and failing that, should be retried along with Count II under Fed. R. Crim. P. 33 ("Rule 33").  In making their Rule 29 argument, the Defendants focus entirely on a conspiracy *to fail to immediately report information* to the CPSC under Count I.  But they do not address the actual Count I conviction that was rendered by the jury, which was a conspiracy *to defraud the United States by obstructing the CPSC's lawful functions* (often called a "*Klein*" conspiracy).[1]

---

[1] *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957).

1

Moreover, in moving under Rule 29 only as to Count I, the Defendants are conceding that there was sufficient evidence for a conviction under Count II for a failure to immediately report.  But when making their Rule 33 argument, the Defendants nonetheless contend that the Court's jury instruction describing the statutory term "immediately" was so "confusing" that a retrial should be granted for Count II, and, should their Rule 29 motion fail, granted also for Count I.  This is so, even as the Defendants essentially concede that the jury instruction on the term "immediately" was an accurate statement of the law.  As for Count I, this is so, even as they fail to articulate just how an allegedly "confusing" (albeit accurate) instruction on the term "immediately" would have materially affected the jury's conviction for a *Klein* conspiracy.  The Defendants also argue that the Court's exclusion of a single document, Exhibit 1033, warrants a completely new trial on both counts, relying on evidentiary arguments already rejected by the Court. The Defendants' Motion should be denied.

## II.     LEGAL STANDARDS

### A.     Rule 29 Standards

Under Rule 29, the Court must enter a judgment of acquittal if the Government fails to present sufficient evidence to sustain a conviction.  Evidence is sufficient to sustain a conviction if, "viewed in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Miller*, 953 F.3d 1095, 1108 (9th Cir. 2020) (cleaned up).  As the Ninth Circuit has made clear, this analysis means that the reviewing court should not "usurp" the

role of the fact finder, but instead defer to the fact finder's resolution of conflicting inferences, presuming that the fact finder (here, the jury) resolved such conflicts in favor of the prosecution even where that resolution does not appear affirmatively in the record. *United States v. Nevils,* 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  In looking at the evidence through this lens, moreover, the question is not whether the Court itself believes that the evidence establishes guilt beyond a reasonable doubt, but whether *any* rational trier of fact could have made that finding. *Id.* at 1164.

To be sure, evidence is insufficient to support a verdict where "mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *Nevils*, 598 F.3d at 1167 (cleaned up).  But the government does not need to rebut all reasonable interpretations of the evidence that would establish innocence, or rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 1164.  *See also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1145 (9th Cir. 2012) ("An innocent explanation is in the realm of the possible. We have previously said, however, that the mere fact that evidence submitted by the government is wholly susceptible to innocent explanations is not enough to reverse a conviction on appeal") (cleaned up).  Not surprisingly given these standards, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

**B.      Rule 33 Standards**

In relevant part, Rule 33 provides that upon a defense motion, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  As compared to Rule 29, the Court has broader discretion to grant a new trial under Rule 33. Among other things, it "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Alston¸* 974 F.2d 1206, 1211 (9th Cir. 1992) (cleaned up). That said, a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up).  However broad the Court's discretion under Rule 33 may be, the Rule is not an invitation to lightly disregard a jury's verdict. *See United States v. Cloud*, No. 22-30173, 2024 WL 49808, at *4 (9th Cir. Jan. 4, 2024) ("While a district court may evaluate witness credibility on a new trial motion, Rule 33 does not give a court license to wholly usurp the jury's role, insofar as it should only grant a new trial in exceptional circumstances where the evidence preponderates sufficiently heavily against the verdict such that a serious miscarriage of justice may have occurred.").

## III.   ARGUMENT

**A.      There is no basis for vacating the *Klein* conspiracy conviction.**

Count I of the Indictment charges a single conspiracy with three objectives. *See* Indictment, ECF No. 1, ¶ 29, at page 9. As explained in Jury Instruction No. 15:

4

> The defendants are charged in Count One of the Indictment with conspiring to commit the following objects or crimes: (1) the crime of failing to immediately report required information to the United States Consumer Product Safety Commission (CPSC), as further explained with respect to Count Two; (2) the crime of wire fraud, as further explained with respect to Count Three; and (3) the crime of defrauding the United States by using deceitful or dishonest means to frustrate and obstruct the lawful functions and efforts of the CPSC.

Jury Instructions, ECF No. 146, Instruction No. 15 at page 17.  The Jury Verdict Form indicates that with respect to each Defendant, the jury specified only objective #3 in reaching their guilty verdict under Count I.  Verdict Form, ECF No. 158 at pages 2, 5 (checkmark next to conspiracy to "Defraud the United States by obstructing the lawful functions and efforts of the [CPSC] by deceitful or dishonest means" only).

Yet the Defendants' Motion focuses its insufficiency challenge only on Count I, and only on objective #1, which was not found by the jury. Defs.' Motion, ECF No. 181.[2]  The Defendants' Motion has therefore trained all of its Rule 29 arguments on the wrong target.  Its Rule 29 challenge simply does not address the Count I conviction (the *Klein* conspiracy in objective #3) as found by the jury.  Accordingly, the Defendants' Rule 29 challenge should be deemed waived or forfeited at this point.

---

[2] *See* Defs.' Motion, ECF No. 181 at 3, ("As to the conspiracy conviction . . . the trial evidence failed to show . . . the defendants entered into an agreement . . . to delay reporting"), at 5 ("the government contended. . . the defendants reached an agreement . . . to delay a recall"), at 7 (the "Indictment does not charge the defendants with delaying a recall . . . but only concerns their obligation to timely report"), and at 8 ("In the most fundamental of ways, there was no meeting of the minds on the object of the conspiracy: delaying the filing of a defective product report to the CPSC").

Should the Court nonetheless reach the merits of the sufficiency challenge on Count I, there was certainly sufficient evidence for the jury to have convicted the Defendants for a *Klein* conspiracy.  Before turning specifically to the *Klein* conspiracy, however, it is worth addressing the Defendants' arguments about the formation of the conspiracy on or about September 19, 2012.

The Defendants contend that Charley Loh's remark at the September 19 meeting about a delay being "fine temporarily" is the "only evidence" on which the government could argue that the Defendants agreed to a conspiracy, and that there are supposedly several "fatal" errors with this evidence.  Defs.' Motion at 6-7.  The Defendants' argument is erroneous for several reasons.

First, proof of a conspiracy does not require a formal agreement or evidence of something akin to a written contract.  Indeed, the jury was properly instructed that "it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy."  Jury Instructions, ECF No. 146, Instruction No. 15 at page 18. Additionally, the Defendants ignore that some of the best evidence of their conspiratorial agreement consists not in their *words*, but in their *actions.* The Defendants contend they firmly rejected an offer to delay on September 19, and that they also "advised that they would promptly report the defective dehumidifiers to the CPSC," thereby precluding any conspiratorial "meeting of the minds." Defs.' Motion at 8.  Yet all of this overlooks their *actions* (or deliberate inaction):  after Larry Lam proposed at least a six-to-nine-month delay at the September 19 meeting, communications with the CPSC did not in fact occur

6

until almost exactly six months later (March and April 2013) and the recall even later (September 2013).

Conspirators can agree to refrain from doing something immediately, and continue to so refrain over ensuing months, even as they engage in various and ongoing verbal squabbles and disagreements about whether and when they will stop refraining (*i.e.*, the length of the delay, timing, etc.). Nor is *threatening* to do the right thing (we must report, we shall report, now we really mean it, etc.) the same as *doing* the right thing (reporting immediately and truthfully to the CPSC). Nothing prohibits a fact finder from placing greater weight on the Defendants' actions than on their words, and it is rational to do so.

The Defendants also characterize certain delay comments made at the September 19 meeting as focusing on a *recall* rather than a *reporting* delay, thus precluding a "meeting of the minds." Defs.' Motion at 6-8. But even assuming *arguendo* that the Defendants correctly characterize those statements, this is a distinction without a difference. The trial made clear that the Defendants' scheme was ultimately about making money and avoiding losses by delaying or avoiding a recall as long as possible, and the conspirators expressly acknowledged that honest reporting to the CPSC would lead to a recall. It is no surprise, and of no moment, that they would often talk about a "recall" even as their scheme necessarily involved a reporting delay.[3] In any event, the Defendants'

---

[3] *See*, e.g., Exhibit 30 (7/26/12 email chain about YouTube video, "this could be the cause of a recall"); Exhibit 34A at 1 (8/9/12 email asking about fire risk, and stating "What we worry about the most is that if any customer files a complaint to the US Consumer Protection Center about us, we will be required to provide a detailed investigation report . . . Otherwise, all related
*(footnote cont'd on next page)*

7

contention that the "delay" discussed at the September 19 meeting could at most have *only* concerned a recall (and not reporting) is contradicted by their own *contemporaneous* interpretation of their interactions with Engineer Ju and Larry Lam in September 2012. During the September 19 meeting itself, after listening to Lam's proposed delay, Defendant Loh made comments that showed he understood that reporting and recall issues were intertwined.[4]   The Defendants' understanding was also spelled out in a company power-point presentation that partially summarized the history of the conspiracy. Exhibit 80A at 12 (December power-point presentation attached to Defendant Loh's 2/6/13 email, "The factory sent Larry and Engineer Ju over, admitting there was a problem with the fire-retardant materials used in the compressor, but asked us not to do anything that might result in a recall, or to delay reporting it till a half year later.").

---

products on the market would be required to be recalled"); Exhibit 48 at 1 (9/8/12 email telling Lam "the time clock is against us and if Gree is not reacting fast enough, We have no choice but to report what we know"); Exhibit 50A at 2-4 (9/13/12 email discussing costs of mandatory and voluntary recall, and expressing a willingness to initiate a voluntary recall with the CPSC to reduce damages); Exhibit 53A at 2 (9/21/12 email summarizing Lam's instruction to delay date of recall and MJC's determination to file a truthful report to the CPSC the following week); Exhibit 68A at 4-5 (11/12/12 email attaching meeting minutes in which MJC provided two options, the first involving reporting to CPSC truthfully with a likely subsequent recall initiated by megastores, and the other being ways to handle the ongoing fire incidents "to conceal and smooth out" albeit with risk of civil and criminal actions); Exhibit 152 at 18-19 (sworn testimony of Defendant Chu regarding his state of mind in September 2012, "I think we should report. . . . . [Q: "…you personally believed that there should be a recall?"] Yes. . . . If in the time we find out they have a plastic it's not UL-compliant, if really we report in that time, I think we will have the recall.").

[4] Exhibit 52 at 21 (Defendant Loh, "If, because this involves the recall, the recall involves very serious, many do involve lots of legal, legal reasons, then at the very beginning we said, if we don't report it, for us, it will have a broad area of legal implications.").

Of course, even if there were verbal squabbles over exactly *how long* the delay should continue to be, that does not obviate the fact that the conspirators had agreed to delay reporting *immediately*.  It is thus of no help to the Defendants if there was arguably some discussion at or after the September 19 meeting about sending things to an independent testing lab or negotiating the specific number of months they were willing to illegally delay reporting.  Defs.' Motion at 7-8.  The point is that failing to report *immediately* was illegal, and the defendants agreed to do – and then, as it turned out, did – just that.  The Defendants clearly left the month of September 2012 understanding they already had enough information that required immediate reporting to the CPSC, and having determined to delay immediately reporting and to do all they could to avoid a recall.[5]  As the months went by, that "temporary delay" obviously continued growing into increasingly longer delay.  Indeed, in December there was even a company power-point complaining about how all their efforts over the previous months had been under-appreciated.  Exhibit 80A at 15 (December power-point presentation attached to 2/6/13

---

[5] *See*, e.g., Exhibit 48 at 1 (9/8/12 email telling Lam "the time clock is against us and if Gree is not reacting fast enough, We have no choice but to report what we know"); Exhibit 53A at 2 (9/21/12 email noting Gree is unable to confirm the real cause for the electrical arc and how wide the problem is, and "the fire retardant materials do not meet the UL standard, which is a fact. Therefore, we think the probability for live fire . . . is still quite big"); Exhibit 55A at 2 (9/26/12 email, "We will still put Gree's overall interests first . . but time is running out"); Exhibit 56A at 3 (9/27/12 writing to Madam Dong, Chair of Gree China, "A preliminary investigation concluded that the fire was caused by overheating from the fault in the compressor and the parts, plus live fire caused by the dehumidifier's plastic casing that did not use fire-retardant materials that meet UL standard. We have also learned further that, none of the fire-retardant materials used on millions of Gree dehumidifiers sold in the United States in the past several years have met the UL standard") and at 4 ("If this incident is not handled properly, Gree may face the largest recall . . . in the history of the United States.").

email, complaining that "Everything we have done to avoid a recall and to safeguard Gree's reputation and interests has totally been ignored."). And as that power-point made as clear as other evidence produced at trial, the conspirators clearly understood that their efforts were unlawful. Exhibit 80A at 12 ("At the time [in September], we felt Larry was asking us to cover up the quality problems"), at 13 (discussing November meeting with Gordon, and noting "if [we act] upon Gree's request, which asked us to cover up the truth of the cause of the incidents for Gree, we may be subject to both civil and criminal liabilities in the US.").

Turning now to the *Klein* conspiracy conviction, the conspirators' scheme to delay and avoid a recall, for as long as possible, included using deceitful or dishonest means to obstruct the CPSC's lawful efforts and functions. These dishonest means became manifest in the March and April 2013 submissions to the CPSC: there were material omissions and misrepresentations about issues the conspirators knew about beginning in September 2012, and about which their knowledge had only grown in the months before the CPSC was finally informed about the dehumidifiers.

On March 14, 2013, approximately six months after the September 19 meeting, Defendants' lawyer finally emailed an Initial Report to the CPSC. Exhibit 97 (email of 3/14/2013). But this "report" did not mention any of the dehumidifier defects and hazards known by Defendants Chu and Loh. Weeks later, MJC America (the Defendants' own company), Gree USA, and Gree China jointly submitted their Full Report to the CPSC on April 30, 2013. Exhibit 125 (4/30/2013 email with letter). But this "full" report

10

deceptively indicated that the "companies have *not* concluded that the subject dehumidifier presents a substantial product hazard or that a corrective action is warranted," and that "Gree Zhuhai's analysis and the UL recertification indicate that the subject dehumidifier *is safe for use as intended*." *Id.* at 6, 8 (emphasis added).

Both of these "reports" flew in the face of information and conclusions that the Defendants themselves had been personally and directly accumulating since September 2012. Indeed, most of the trial was devoted to evidence about just that. Referring to only some of that evidence here suffices to demonstrate how there was *vastly* more than sufficient evidence of the Defendants' deception in interacting with the CPSC.

Well before March and April of 2013, the Defendants obviously knew that their dehumidifiers were unsafe and defective because they could spontaneously burst into flames; believed that the corrective action of a "recall" was both warranted and inevitable; and knew that the dehumidifiers used plastics that failed to meet UL flame-retardant standards, thereby contributing to the unreasonable risk of serious injury or death that was posed by the dehumidifiers. *See* exhibits discussed *supra*, n.3 and n.4. Defendant Chu had even personally burned the outer shell of a dehumidifier and observed that the plastic was the opposite of flame-retardant.[6] The September 19 meeting itself had confirmed problems with non-UL-compliant plastics, the compressor, and safety, as acknowledged

---

[6] Exhibit 45, translation of video/audio attached to email of 9/4/12 [Exhibit 43] (Chu: "The fire is getting bigger and bigger, it's abso...absolutely not fire-retardant!"; Voice 2: "Mmm. It's combustion enhancing instead."; Chu: "Exactly, because the plastic stuff, the ABS stuff, right?"). *See also* Exhibit 42 (email of 9/4/12, Charley Loh writing about testing result that "shows the units all can catch the fire and apparently the material is not according to UL standard!").

in Defendant Chu's own sworn testimony,[7] and that same month Defendant Loh wrote of his belief that the "probability for live fire . . . is still quite big." Exhibit 53A at 2 (9/21/12 email). MJC had its own "Intertek" report of November 5, 2012, showing that the dehumidifiers had serious problems, Exhibit 66, which were indeed enough to cause Defendant Loh to temporarily halt the sale of certain dehumidifiers.[8] Indeed, the company power-point presentation discussed how a third-party's testing report [namely, Intertek] had shown that dehumidifiers models below 45 pints have an installation structure with "serious safety hazards." Exhibit 80A at 19. By April 4, 2013, a now-deceased coconspirator wrote about how non-compliance with UL standards for all Soleusair [sic] Powered by Gree dehumidifiers sold in the US from 2010 to 2012 "could create an unreasonable risk of serious injury or death." Exhibit 109 at 2. By April 23, 2013, Defendant Chu had even commissioned and received a report from CRT Labs that showed all sample dehumidifiers (from 2010, 2011, and 2012) failing to meet applicable UL flame-retardant standards. Exhibit 113.

The conspirators deliberately omitted this and other information from their "reports," and made deceptive and dishonest representations to the CPSC, when they

---

[7] Exhibit 152 at 24-25, 27 (Defendant Chu acknowledges hearing Lam saying at the September 19 meeting that the dehumidifiers used non-UL-compliant plastics, that there was a problem with the overload protector on the compressor, and that there was a safety issue, and that he understood in September 2012 that a reason for fire was "arcing on the terminal of the compressor").

[8] Exhibit 156 at 27-28 (Defendant Loh testifies that Intertek report said "they might have design flaw on the compressor, could cause the fire;" and that he [temporarily] stopped selling certain dehumidifiers because of the report and the potential "harm [to] the consumers").

12

communicated with the CPSC in March and April 2013.  Unfortunately, this was hardly surprising.  Deception and dishonesty had been an essential part of the scheme since September 2012.  The goal all along had been to keep making money and to mitigate losses.  And that meant not only delaying reporting and a recall for as long as possible, but also hiding and obfuscating information from consumers, retailers, insurers, and the CPSC at every turn.  And of course, in the meantime they just kept on selling their dehumidifiers, even after sending deceptive and dishonest communications to the CPSC.  *See* Exhibit 135 (6/12/2013 email with stop-sale notice).

Even before the September 19 meeting, Defendant Loh was writing to Larry Lam to ask about what compensation Gree would provide if "MJC management members get in legal trouble" and if MJC went bankrupt, Exhibit 48 (email of 9/8/12) at 1.  On September 10, 2012, he wrote Madam Dong regarding Gree headquarters' instruction that MJC not tell the CPSC about non-UL compliant materials and the overheating of parts that could be the cause of fire incidents, and he warned that "[i]f we fail to report truthfully . . . the first in line to bear the brunt will be MJC, and MJC's leaders, me included."  Exhibit 49A at 2.  At the September 19 meeting, among other things, Lam explained how newly improved products could be in the market by the end of that year or early the following year, and that the proposed delay would be beneficial because ultimately products pulled from the shelves for investigation at that point would already be the newly-designed units; he also made clear that a third-party test of the dehumidifiers would be "detrimental."  Exhibit 52 at 16-19, 31.  Lam also claimed that Gree had sampled competitors'

dehumidifiers and learned that none had used "fire-retardant materials at all," and that during certain competitors did not mention this issue when they initiated their recalls. Exhibit 52 at 32-33. Defendant Chu then interrupted Lam with confirmation that he understood the gist: "avoid major things by focusing on minor things, right?" Exhibit 52 at 33. Of course, this but foreshadowed their future deception in deliberately failing to mention known issues with their non-UL-compliant plastics when they finally communicated with the CPSC in March and April 2013.

By November 12, 2012, Gordon Zhang was emailing minutes of a meeting with MJC in which MJC would discuss only two options going forward:  the first involving reporting truthfully to the CPSC with a likely recall being initiated by the mass-merchant retailers, or the second being the continued handling of fire incidents in a way "to conceal and smooth out," albeit with a risk of civil and criminal actions. Exhibit 68A (11/12/12 email attaching minutes) at 4-5. Defendants and their coconspirators ultimately agreed to the latter. As mentioned above, the December 2012 power-point confirms that MJC was being asked to "cover up" the quality problems and "the truth of the cause of the incidents for Gree," while acknowledging the possibility of civil and criminal ramifications. Exhibit 80A at 12, 13. And on November 29, 2012, Defendant Loh claimed that "MJC's attorney(s) have warned us that even if the company faces bankruptcy, we must immediately submit to the [CPSC] the details of the product accidents we already know," although "[o]f course our premise is that we are still willing to solve this problem through win-win." Exhibit 74A at 3 (11/29/12 email with attachment). This last was but one of

many examples demonstrating Defendants' propensity for openly acknowledging what they understood to be legally required even as they willfully continued to ignore what was legally required.   And all of it underscored their knowing willfulness in withholding information and misrepresenting what they knew when the time came that they actually communicated with the CPSC.

The jury therefore had before it abundant evidence of the Defendants being willing participants in a *Klein* conspiracy.   Drawing all reasonable inferences in favor of the government, there is absolutely no basis under Rule 29 to ignore the jury's verdict and acquit the Defendants of Count I.

**B.      There is no basis for ordering a new trial.**

As noted above, Rule 33 provides that where exceptional circumstances preponderate so heavily against the jury's verdict, the Court may order a new trial notwithstanding the jury's verdict when a failure to do so would amount to a serious miscarriage of justice.   Although conceding that there was sufficient evidence for the jury to have found them guilty of the failure to immediately report under Count II, the Defendants want a different jury to hear the *same sufficient* evidence and to consider Count II all over again, along with Count I should the Court not acquit them outright pursuant to their Rule 29 argument.   They insist this should be done because of five words they dispute in a jury instruction, and because of a single document that the Court excluded from evidence.

15

### 1. **The Jury Instruction**

At trial, the Court provided a jury instruction for the failure to immediately report charge in Count II. The instruction provided a dictionary definition of the term "immediately," further described how certain CPSC regulations interpret the term, and informed the jury that it was not required to follow the CPSC's regulations as it deliberated over whether the Defendants failed to immediately report as required. The only dispute the Defendants raise about that instruction is that the Court told the jury the truth about the legal effect of the CPSC regulations: that they were not binding on the jury.

In relevant part, the statutory scheme for Count II requires that a covered person, upon receiving information that a consumer product contains a potential substantial product hazard defect or creates an unreasonable risk of serious injury or death, "shall immediately inform the Commission . . . of such defect, or of such risk." 15 U.S.C. § 2064(b)(4). The statute does not otherwise define "immediately." However, the CPSC has issued an interpretive regulation, explaining their view that the obligation to report "immediately" means "within 24 hours." 16 C.F.R. § 1115.14(e), and while one may investigate to determine whether the information is reportable, the investigation should not take more than 10 days unless it can be shown that additional time to investigate is reasonable. *Id*. § 1115.14(d).

The March 2012 CPSC "Recall Handbook," passed between the Defendants and coconspirators in September 2012, mirrors this regulatory language, stating in relevant part:

16

Section 15 requires firms to report "immediately." This means that a firm should notify the Commission within 24 hours of obtaining information described in section A.1. . . . A company **must** report to the Commission within 24 hours of obtaining reportable information. The Commission encourages companies to report **potential** substantial product hazards even while their own investigations are continuing. However, if a company is uncertain whether information is reportable, the firm may spend a reasonable time investigating the matter. That investigation should not exceed 10 working days unless the firm can demonstrate that a longer time is reasonable under the circumstances. Absent such circumstances, the Commission will presume that, at the end of 10 working days, the firm has received and considered all information that would have been available to it had a reasonable, expeditious, and diligent investigation been undertaken.

Exhibit 50 at 13 (emphasis in original). From 2012 to 2013, therefore, the Defendants worked under a statute that required them to report certain information "immediately," and with explicit knowledge of a Recall Handbook that referred to that statute and that made clear that the CPSC's view of that term "immediately" was 24 hours or at most 10 working days.[9]

In its proposed jury instruction for Count II, the government proposed not defining "immediately" at all, as the statutory language was clear and commonly understood. Were the Court to nonetheless determine that a definition was necessary, however, the government proposed both a dictionary definition and reference to the regulations: "To 'immediately inform' the [CPSC] means to report the required information promptly without unnecessary delay; straightaway. The CPSC's regulations, which you are not

---

[9] In its closing argument, the government discussed the evidence showing that the Defendants' actions revealed they were aware of this 10-day window. *See* Trial Transcript, Day 5, 11/15/23, at 84-86.

17

required to follow here, define 'immediately' as within 24 hours." Joint and Disputed Jury Instructions (Annotated), ECF No. 106 at 62-63, 65-66.

All of this was consistent with the government's position pre-trial.[10]  The CPSC's interpretation of "immediately" is a more generous standard for the Defendants than the plain meaning of the statute.[11]

The Defendants contended the jury required some "practical definition" of "immediately" and that the "only reasonable source for such a definition is the [CFR] and the CPSC Recall Handbook available to the [D]efendants at the time of the alleged offense."  ECF No. 106 at 72.  After hearing argument from the parties and additional proposals from the Defendants, the Court fashioned the final version of the jury instruction.

---

[10] The Defendants claim the government's position is a "complete reversal" from its pre-trial position.  Defs.' Motion at 9-10.  Not so.  The government has consistently argued that the statutory term "immediately" is easily understood by the public and does not need to be defined.  In the Government's Opposition to Defendants' Motion to Dismiss Counts 1 and 2 on Constitutional Grounds, among other things, the government noted that the term "immediately" must be construed according to its ordinary meaning, that it passed constitutional muster by itself, that the government was "seeking to enforce a facially clear statute – not a regulation – against Defendants," and that interpretive regulations issued by an Agency are not evidence that the statute itself is impermissibly vague.  ECF NO. 89 at 21-24, 24.  The government did argue that the regulations mitigated against the "arbitrary enforcement" argument made by the Defendants, as these governed law enforcement discretion and mitigated against a statute's perceived vagueness, and *limited* law enforcement discretion in enforcing the statute.  ECF No. 89 at 26-28.  But this most certainly is not the same, as the Defendants would contend, as arguing that the regulations actually define statutory terms.

[11] *Cf.* Government's Opposition, ECF No. 89 at 27 ("the regulation explains that manufacturers should report 'within 24 hours.'  16 C.F.R. § 1115.14(e).  As explained above, this is an even more generous standard than contemporary dictionary definitions.").

18

The Defendants' initial proposal, a subsequently emailed proposal, and the final instruction were as follows:

| | |
|---|---|
| **Defendants' Initial Proposal**<br>Under the law and the CPSC regulations, the term "immediately" does not mean "instantly." Rather, the defendant acts "immediately" if he reports within 24 hours. If the defendant is uncertain whether information is reportable, the defendant may spend a reasonable amount of time investigating the matter.<br><br>–Defendants' proposed instruction, ECF No. 106 at 67-68 [10/25/2023]. | **FINAL INSTRUCTION GIVEN TO JURY**<br><br>To "immediately" inform the CPSC means to report the required information promptly, without unnecessary delay. The CPSC's regulations, which you are not required to follow, define "immediately" as within 24 hours and provide that if the defendant is uncertain whether information is reportable, the defendant may spend a reasonable amount of time investigating the matter, which should not exceed ten working days unless defendant can demonstrate that a longer time is reasonable in the circumstances.<br><br>–Jury Instruction, ECF No. 146 at 27. |
| **Defendants' Emailed Proposal**<br>To "immediately" inform the CPSC means to report the required information promptly, without unnecessary delay. The CPSC's regulations define "immediately" as within 24 hours unless the defendant is uncertain whether information is reportable, in which case the defendant may spend a reasonable amount of time investigating the matter.<br><br>–Defense proposal via Email to Chambers on 11/14/23 @4:08 pm, ECF No. 174 at 13. | |

As can be seen, the Defendants' proposals omitted both the CFR and the Recall Handbook's 10-day limitation, even as they cited it in their discussion of the initial proposal. ECF No. 106 at 71-72.

All of this procedural history amounts to the following: The statute simply uses the term "immediately" (which the Court already found to be constitutionally sound, ECF No.

19

94, 7/25/2023 Order Denying Motions to Dismiss).  The Defendants do not dispute that the jury instruction used the proper dictionary definition of "immediately," or that it accurately recited the CPSC's interpretation of "immediately" in its Recall Handbook and regulations.  The Defendants do object to the jury being told that it did not have to follow the CPSC's interpretation ("which you are not required to follow").  The Defendants do not argue that this was inaccurate as a matter of law, but instead assert that the instruction was "confusing and misleading" because it gave the jury "one possible meaning" of the term and then told the jury that it "could ignore that definition."  Defs.' Motion at 11.

Yet the Defendants do not explain exactly how this accurate statement of the law was confusing or misleading to the jury.[12]  There is simply no basis to think that the jury could not easily distinguish between the two short explanations of the term "immediately," and understand that they were not required to follow the CPSC's regulations.   The Defendants also offer no explanation as to how, in a trial with such overwhelming

_____

[12] The Defendants do suggest that juror "confusion" is evident in the "contradictory verdicts" the jury rendered in acquitting them of conspiracy to fail to immediately report while convicting them of the substantive offense of failing to immediately report. Defs.' Motion at 11-12.  The government does not concede that this result is contradictory.  But, even if it were,  it is axiomatic that inconsistent verdicts are evidence of nothing in our legal system, as they could be a result of jury lenity or other factors which courts do not attempt to reconcile.  *See*, e.g., *United States v. Galecki*, 89 F.4th 713, 735 (9th Cir. 2023) (rejecting defendant's argument that a person acquitted on all charges can not be considered one of the requisite coconspirators); *United States v. Hart*, 963 F.2d 1278, 1280-82 (9th Cir. 1992) (declining to discern whether there is a true inconsistency between a conviction for a conspiracy and an acquittal of the underlying substantive offense, as legally the alleged inconsistency between verdicts cannot be considered). *See also United States v. Powell*, 469 U.S. 57, 58 (1984) (again affirming a more-than-fifty-year-old principle that a "defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.").

evidence of actual and extended delay, the jury could have been so confused as to render a verdict inconsistent with the "immediately" requirement of the statute.

As for Count I, the Defendants provide no explanation as to how an instruction on the term "immediately" could have affected the jury's conviction for a *Klein* conspiracy whose elements did not include a failure to report immediately.  Furthermore, the trial evidence showed months and months of delay, well beyond even the 10-day period discussed in the Recall Handbook, along with evidence such as Defendant Chu's sworn testimony that he believed both reporting and a recall should have happened in September 2012.  As a result, any alleged imperfection in the Court's jury instruction for the term "immediately" would have been harmless at this trial.  There is certainly no basis to overturn the verdicts and order a new trial under the "in the interest of justice" standard of Rule 33.

### 2. Exhibit 1033

Although they devote but a single paragraph to the issue in their 10-page motion, the Defendants also argue that the Court should order a new trial on both counts because the Court sustained the government's objection to proffered Defense Exhibit 1033.  The Defendants describe Exhibit 1033 as a report from Larry Lam on October 8, 2012, in which Lam "explicitly acknowledged" the Defendants' rejection of his six-to-nine-month delay proposal.  Defs.' Motion at 5-6, n.2 at 8.  Their only argument for its admission is to simply repeat what they asserted at trial:  that the exhibit falls within the "state of mind" and "residual hearsay" exceptions to the hearsay rule.  *Id.* at 5.  But the Court already

considered and rejected these same arguments, after considering the government's oral and written opposition. *See* Government's Opposition to Defendants' Motion in Limine to Admit Exhibits 1030, 1031, and 1033, ECF No. 142, at 5-6. The Defendants offer no compelling reason for the Court to revisit its previous ruling now.

Of course, at trial the jury was presented with a variety of exhibits in which MJC itself, and one or more of the MJC conspirators, directly wrote of their stated intention to reject the proposed delay in reporting immediately (albeit even as they were refraining to report immediately just the same). Many of these are cited in the Defendants' Motion, and the defense already made their arguments about this evidence before the jury. Exhibit 1033 is cumulative and repetitive in that regard, and its exclusion was harmless in any event. The jury already considered and rejected this argument in reaching its verdicts, and at least with respect to Count II – the only of the two Counts which was dependent on proof of an intent to delay – the Defendants have conceded there was sufficient evidence for a conviction. Given all of this, there is certainly no basis to order a new trial under Rule 33's "interests of justice" standard under either Count because of Exhibit 1033.

## IV.   CONCLUSION

For all the foregoing reasons, the United States respectfully requests that this Court DENY Defendants' Motion for Judgment of Acquittal Notwithstanding the Verdict and for a New Trial.