## Charley Loh

| | |
|---|---|
| From: | gordonzhang@gree.com.cn |
| Sent: | Mon 11/12/2012 10:56 PM (GMT-00:00) |
| To: | Charley Loh; Jimmy Loh |
| Cc: | |
| Bcc: | |
| Subject: | meeting minute 1st R. |
| Attachments: | Ê×ÈÔ»ã±´1108.doc |

Dear Charley and Jimmy,

Here enclosed the 1st meeting minutes fYI.

Please kindly review it,Regarding to the issues potential solve proposals,please get your input.

then feedback to GREE Management.

Best Regards,Gordon



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:19-cr-00193-DSF
UNITED STATES OF AMERICA
VS. SIMON CHU and CHARLEY LOH
PLAINTIFF'S EXHIBIT 068A
DATE _____ IDEN.
DATE _____ EVID.
BY _____
Deputy Clerk

Report on the First Day of My Visit

Agenda for the First Day:
- Background of MJC and the History of Its Cooperation with Gree
- Current Problems of GREE USA;
- Fire disasters, should it be recalled?

I. Background of MJC and the history of its cooperation with Gree (Quick Summary)

1. Founded in 1998, MJC made its start as an agent for Hitachi's compressors business in the Americas. At the time it mainly supplied FEDDERS to Argentina in South America. At the same time it brought in part of Hitachi split type air conditioning products and developed portable units with high profit margins.

1.2. In 2000, [MJC] cooperated with Gree for the first time in promoting the old model, KY-24 portable units; expanded to promote window units in 2002; and then KY-32 portable units; Because MJC had been cooperating with Gree to develop double air duct products, which took three years but no products ever came out of it as of 2005, MJC then switched and made a huge investment to open mold in a "obedient" factory and provided the design concept. Under this model of MJC providing the product idea with cooperation from the factory, [MJC] was able to develop multiple product lines (single cooling/cooling plus heating/single air duct/double air duct/super-large cooling capacity—such as 14KBTU large portable units and cooling and heating units with "color display" indicators and a water pump). Together with their novel exterior and a unique sales model, these products became number one in the then portable air conditioner market; From marketing them in regular small sale locations to promoting them as priority products in megastores, MJC played an immeasurable role in growing its market and its sales went from just several hundred thousand units at the time to today's market capacity of "close to one million units." As of now portable units are one of the must-have items showcased in all megastores. However, due to impact from other brands such as LG/SHARP/DELONGHI/DANBY/HAIR, etc, MJC's market share has gradually declined.

1.3 Meanwhile, the company realized in its development that having only one single product carries a risk and it is hard to serve the megastores well. Therefore, it has gradually expanded its product lines --- fans, electric heaters, water dispensers, a full line of portable air conditioners, portable refrigerators, and small red wine cabinets, etc. This action enabled MJC to survive amidst the wild waves of the financial crisis and quickly bounced back in 2010: its sales volume in 2008 was over 700,000 units and 630,000 units in 2009; it recovered rapidly in 2010 and increased to 1.04 million units in total sales.

1.4 [MJC] also reported that in 2010 and before, the total value of its own business was about $40 million, with a net profit of 10%, which was around $4 million.

2. [MJC] brought up again the previously negotiated pricing and support principle (which I myself have no way to verify)

1) Director Li, Director Lam*, and Director Xiao had mentioned in the past that a margin of 14~16% shall be kept between the ex-factory price and resale price to assist [MJC] to promote the Gree products vigorously. ------ the calculation at the time was made with reference to the margin for E customers. However, Gree has failed to keep its promise now and currently that margin stands at 6.05% only.

2) [MJC] pointed out that the leaders of our company had mentioned and promised at the meeting(s) that:

A. The positioning of the Gree brand's appearance [on the market] is not positioned as low-end products (to avoid the predicament of HAIR, which is synonymous with being cheap); low-end products shall enter the market using MJC's original brand of SOELUSAIR and should try to bring the Gree brand into the market. Therefore, [MJC] can start its sales in a cooperative model of SOLEUSAIR Powered by Gree first. After products become mature and the market is more acceptive of the Gree brand, the high-end products will use the GREE brand, while low-end products use Soleusair.

B. Light commercial products, such as the high value added large and small through-the-wall (TTW/PTAC) household units, split type units, automobile air conditioners, one-drive-many units and other products will use the Gree brand first.

   C. Gree shall support Gree USA with price at cost. When reselling the original business of its own to MJC, Gree will have 1%~2% [profit] retained at Gree USA.

   D. [Gree] will no longer develop new OEM customers and the OEM [business] will also be brought under Gree USA for management to support Gree USA with all its strength. (Going forward GE may also be placed under Gree USA for management----not accurate, needs to be investigated in detail.)

   3. [MJC] talked about that it keeps its promises and hopes Gree also keeps its promises;

II.   Current Problems of GREE USA

1. Pricing problems
   Currently, prices for the megastores have been set, but supply prices for local inventories have not been set yet----DSP--prices. Last year because the local warehouse(s) failed to ship on time or it was too late to provide products or the prices were too high, there were order opportunities of close to 80,000 units that did not ship, out of which 36,000 units were due to the local BV warehouse unable to ship on time; and prices deemed too high--- by 5% for opportunities of the other 44,000 units.

   This is indeed a big dilemma for us now. The ex-factory price itself is on the high side slightly, plus the warehouses subleased by Gree headquarters also have high storage costs; When combined, the ex-factory price is even higher. The units that did not sell in 2012 had to be piled up there for another year. With storage fee added on top, the price at cost quoted is even higher, much higher even than that of new products. As a result, the sales team simply can't sell them. Since the property right of these products belongs to Gree, there is even less incentive to sell these clearance inventories. These become excess units very easily, which is especially detrimental to Gree.

   The hard truth is that inventories must be cleared out in a timely manner. [We] respectfully request the company consider authorizing and completing the clearance of these items at market price. For example, sell these at a price of 2-3 [%] points higher than products directly sold and shipped to the megastores, so that the "inventory" can start moving. However, by doing this, Gree may very likely have to bear the loss in storage costs---There is no way they can be added in full to the sale price.

   [MJC] requests that Gree try to understand the United States and set prices that are in line with the market principles and comparable to the local market price, especially the local supply price.

2. The warehouse problems mentioned above---dilemma: Would rather sell new products than products in the inventory.
   1) Since Gree subleases the warehouse(s), it needs to go through the carrier's logistics company to find its US partner who then tries to search and rent the warehouse(s); when Gree USA needs to ship the goods, it must go through the Gree headquarters first before going through the logistics company, then through the partner, and finally to the warehouse. The entire process plus the time difference is often [too long] to be able to meet the requests of supply goods locally: to complete the truck loading 48 hours (within 72 hours) after the order is placed, resulting in fines and order cancellations, and at the same time, the buyer's partner's carrier inflates the shipping fee.

   Since the Gree headquarters owns the property rights of the goods and controls the warehouse, its overall cost is high; - with each year going by, the storage cost accumulates, which is then added to the price of the goods. **As a result, the price of new products is cheaper than that of the old ones**----creating a dilemma: [people] would rather sell new products than selling the storage products. The cost of the storage items becomes higher and higher. **They eventually become obsolete units, [and] quasi-obsolete units.**

3．Suggestion for the New Local Stock up of Goods

   1) Change the stocking method.  The Gree headquarters and Gree USA sign a 'consignment contract', or a 'sales contract':

Gree sells to Gree USA at DI direct sale price, but on account with the term extended to 540 days, or 60 days after goods ship from the local warehouse(s), whichever comes first.

   2) Stipulate in the contract that Gree's creditor right has the priority in getting paid.

   3) Gree USA leases the warehouse(s) and bears the storage cost. Once goods arrive in Gree USA's warehouse, it generates an invoice; Gree USA is in debt to the Gree headquarters which has the priority in getting paid.

   4) Designate a person to authorize outbound shipment from the warehouses(s). For example, outbound shipment cannot leave the warehouse(s) unless with the signature of the CFO on our side. The monthly report of the warehouse is submitted to our CFO who has the authority to audit and inspect the warehouse(s). He (She) can also designate personnel to audit and inspect the warehouse(s).

   This method can push the joint venture company to speed up the shipping process. At the same time, if goods cannot ship on time and need to be sold at a discount for promotion, it will be borne by the sales company and the real final cost shall be shared by both parties of the joint venture together.

   Risks: in case goods are lost (stolen, other losses), generally the insurance will pay in full; if the insurance payment is insufficient, the joint venture company will pick up the loss of the difference; shared by the two shareholders: the Gree headquarters needs to bear 51% of the loss (difference) only.

4. The Gree headquarters didn't provide insufficient support: its shipping was not on time, quality not controllable and product development not on schedule; - the export department is under too many restrictions – unable to manage and coordinate other departments. It lacks " people" who can control various departments in a unified way. Other departments always think Gree USA is no different from an "OEM" customer, and rarely take Gree USA's feedback seriously, which is detrimental to Gree USA and will not have a future. Therefore, this mentality must be changed and act as we are one TEAM.

III.  Fire disasters, should it be recalled?

 1. A total of 12 [fire disasters] have occurred:

  Model involved:  portable unit, 1 case, having live fire; dehumidifiers, 11 cases, 9 of which had live fire, and the other 2 had overheat and unusual odors;

  Casing involved: currently more than 10 cases are small casing units, casing of the other case is unknown.

  Distribution among the buyers: 9 were sold from MENARD stores, including portable units; LOWES, THD and MILLs each had 1 case; and there was 1 case involving a GE product, also happened at MENARD.

  [Among these] are goods supplied in 2010, as well as goods supplied in 2012.

  2.  MJC gives two options only:

    1) Report back to CPSC truthfully

    Currently CPSC is about to serve a second letter; it will involve responses to the following questions:

    a.  Regarding incidents reported, what investigation has been conducted, and what is the cause; please provide relevant evidence/or proof;

    b.  Whether similar reports have been received and how many similar cases were already reported;

    c.  Please determine if this 'cause' will result in personal or property damages; (New additions: yes or no, who is involved and what kind of 'damages' have been incurred. Whatever is known must be reported back truthfully. – or can claim don't know as an excuse)

   MJC now has partial reports from the insurance company (ies) already which point to the structural design of the compressor and the overload [protector] – and think problems exist in this area. These reports were not even provided to us; at the same time MJC should be commissioning [some institution] and has completed a third-party independent test. As to the test result, [they are] not willing to disclose yet.

   --If a report is filed to CPSC truthfully, all megastores will be notified by CPSC that: the products have hidden hazards that may cause personal, or property damages and multiple cases have occurred. As to the consequence, there is a big chance that the megastores will initiate a recall. Once one megastore recalls, others may also follow suit unless Gree is certain and can identify the range of barcodes and say products with other barcodes will not have problems.  This way a limited recall can be initiated for a limited range of barcodes. The recall must be published and covered in the US media and websites.

At the same time, the 'partner media' inside China must also publish the recall; once a case occurs outside the [recalled] range of barcodes, the recall will have to be expanded, to the extent of even affecting the number of products with a similar design and sold across the board in the United States.

This result will have an enormous impact. Even if only 20% of the end products are eventually recalled and replaced, given the close to 950,000 small casing units shipped from 2010 to 2012, it requires 190,000 replacement units —at $90/unit, that is a value of $17.1 million, plus damage in reputation and the impact from lost orders in the future.

------ Compensation varies.  There is product replacement; there are also those who insist on having a refund, their sales profit needs to be refunded as well.  Some megastores give consumers the right to choose. The general return rate is: for 2010 products, (2~3 years after they were sold) it is about 15%; for 2011 products (1~2 years after they were sold) it is about 20~30%, for 2012 years (sold in the same year, the return rate will be very high) may be as high as 50%, even around ~70%.

The number of 08 small casing units shipped to GREE USA/MJC is: 373,159 units in 2010; 159,151 units in 2011; 274,055 units in 2012.  Total: 806,365 units.

Based on MJC's total shipment of all small casing units in 2010, there were 373,159 units. At the return and replace rate of 15%,  55,975 units are needed. If calculated at the price of RMB 90/unit: that is 5.04 million RMB.

We didn't sign a contract with MJC. Protection in this area is not mentioned. They are one of the parties that suffer direct losses.

2) Ask MJC to find ways to handle and complete ---- to conceal and smooth it out;

MJC believes that this approach involves the risk of both civil actions and criminal offenses; there are personal risks and corporate risks.

Once they choose the method ------ to conceal and smooth it out, they plan to dissolve the company within three to six months,  equivalent to losing a company platform they have operated for 15 years.

[MJC] requests that Gree pay compensation, **in the amount of ten times their annual profit for the past two years** to pay/**acquire them**. This way all staff members are moved into Gree USA, and the business of other products will also be incorporated into Gree USA. If calculated in the method specified under I. 4, it costs $40,000,000 payable in three installments: one half to be paid before any action is taken (50%--$20,000,000), 50% of the remaining half (25%--$10,000,000) to be paid in one year, and the remaining balance to be paid in full in two years (25%--$10,000,000).  When staff members are incorporated into Gree USA, a contract to safeguard the company business can be signed, for example, serving Gree USA for five years; or/and not to engage in other competing business or companies of the same industry.

After MJC dissolves its company within 3 to 6 months as planned and in case more hazards occur in products under the name of their company, it shall be borne by the insurance company. At the same time, set up another service company to handle the subsequent after-sales service, and use similar solutions to handle similar problems that may occur in the future.

We need to hire a professional attorney for consultation --- Since they have bought product insurance, in case more hazards occur after the company is dissolved, who should be responsible? Does the original insurance still provide coverage and if the manufacturer is still held accountable for liabilities?

We didn't sign a contract with MJC. Protection in this area is not mentioned. They are one of the parties that suffer direct losses.

Other than the above two options, MJC has no intention to talk to us about other approach.

Judging from the price they are asking, it is not low; we need to figure out a way to find out that, in the United States generally when acquiring a company, what are the benchmarks used to set a price? Can we pay to hire a third party to provide a valuation?

We can also bargain and make a reasonable counteroffer.

The above is reported to the company leaders to read through first.

Thank you for your support!

Export Department
Guoqiang Zhang

November 8, 2012

*[Translator's note: Larry Lam's Chinese name "林浩刚" can either be spelt as "Haogang Lin" in the Mandarin spelling system used in mainland China or as "Hou Kong Lam" in the Cantonese spelling system used exclusively in Hong Kong. Since the Chinese always say their last name first, the two names sometimes appear as Lin Haogang or Lam Hou Kong.]